## A08A1502. SMITH et al. v. HARRIS.
(670 SE2d 136)

ANDREWS, Judge.

On May 21, 2004, Pauline Harris brought this medical malpractice action against Newnan Hospital; Dr. Stanley W. Smith, M.D.; Smith's practice group, the PAPP Clinic ("the Clinic"); the homecare provider Healthfield, Inc.; and others (collectively, "the defendants"), alleging that Dr. Smith's negligent administration of the antibiotic Gentamicin in May and June 2002 resulted in injuries including renal damage and inner ear damage. At the close of

---

[5] Id.

[6] See *Harris v. State*, 204 Ga. App. 11, 12 (1) (418 SE2d 394) (1992).

Harris's evidence at trial, the defendants moved for a directed verdict on the basis of the statute of limitation (OCGA § 9-3-71 (a)). The trial court denied the motion. The jury later awarded Harris $586,181 against Smith, the Clinic, and Healthfield, and the trial court entered judgment on the verdict. After Healthfield settled the case, the trial court denied Smith's and the Clinic's motion for judgment notwithstanding the verdict and for new trial.

On appeal, Smith and the Clinic renew their argument that Harris's claim is time barred. They also assert that the trial court erred when it admitted evidence concerning prior acts of alleged negligence occurring more than two years before Harris filed suit and when it permitted a pharmacist, Michael Katz, to testify concerning the negligence of Dr. Smith, a medical doctor and internist. We conclude that by May 15, 2002, Harris suffered renal damage and other symptoms as a result of Smith's treatment of her. Because Harris did not bring her claim until more than two years after that injury, her claim is time barred, and the trial court's denial of the defendants' motions for j.n.o.v. must be reversed.

A trial court may grant a motion for j.n.o.v. only when "there was no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, demanded the verdict sought." (Citations and punctuation omitted.) *Harrouk v. Fierman*, 291 Ga. App. 818, 820 (1) (662 SE2d 892) (2008).

Viewed in the light most favorable to the jury's verdict, the record shows that on April 28, 2002, the 61-year-old Harris went to the Newnan Hospital emergency room complaining of shoulder pain. Dr. Smith, who was on duty, admitted her for pain management and tests, which showed that Harris was suffering from osteomyelitis, a potentially fatal bone infection. Dr. Smith prescribed a course of antibiotics. On May 4, a different doctor on call for Dr. Smith began treatment with an aminoglycoside antibiotic known as Gentamicin.

The two primary potential side effects· from Gentamicin, a "reliably toxic" drug, are nephrotoxicity, or renal damage, and ototoxicity, or inner ear damage. Studies offered by Harris showed that in a 14-day treatment regimen of Gentamicin and one other antibiotic, 30 percent of patients suffered significant renal damage — what Harris's medical expert described at trial as "a very high rate of adverse effects, especially for an organ system that is [as] important as the kidney." The nephrotoxic effects of Gentamicin can be measured by blood levels of serum creatinine, a naturally occurring substance which shows the extent to which nephrons, the filtering cells in the kidney, are being destroyed by the toxin.

Tests taken on May 5, 6, and 7 showed that the level of creatinine in Harris's blood were 1.0, or normal. On May 8, Harris

was sent home under a treatment regimen of two antibiotics, including a continued course of Gentamicin at a dose of 160 milligrams a day. On May 15, Harris was readmitted to the hospital with continued pain as well as nausea, a common side effect of treatment with antibiotics including Gentamicin. On readmittance, Harris showed the same strain of bacteria in her shoulder bone as in the original infection, suggesting that the course of antibiotics was not accomplishing its goal of eradicating the osteomyelitis. That same day, Harris's creatinine level also reached 1.3, showing that after one week on the drug, her renal function had decreased by 30 percent.

Though she complained of nausea repeatedly, including on May 17 and May 20, Harris was released from the hospital once again on May 22 without a change in her Gentamicin regimen. Creatinine tests administered on May 22 and May 29 showed an increase to a level of 1.4; no creatinine tests were administered between May 29 and June 18. On the latter date, however, Harris developed blurred vision and dizziness so severe that she was unable to walk, indicating irreversible inner ear damage. The next day, June 19, when doctors ordered Harris off Gentamicin, her creatinine level measured 2.4. Harris now shows creatinine levels of between 1.5 and 1.7, indicating substantial long-term renal damage; is unable to focus on moving objects; and cannot walk without blurred vision and dizziness.

At trial, Harris presented two expert witnesses: Michael Katz, a pharmacist, and Keith Beck, a medical doctor specializing in infectious diseases. Both testified that Dr. Smith had violated the applicable standard of care when he prescribed Harris Gentamicin, when he failed to recognize Harris's developing Gentamicin toxicity, and when he failed to reevaluate her treatment, including the medication, on or after May 15. Dr. Beck testified, for example, that had Harris ceased taking Gentamicin in mid-May, she would not have suffered as extensive renal damage as she eventually did, and that it was "overwhelmingly likely" that she would not have suffered any inner ear damage.

1. Because the pharmacist Dr. Katz provided much of Harris's evidence against Dr. Smith, we first consider whether the trial court erred when it allowed Dr. Katz to testify concerning Dr. Smith's negligence.

OCGA § 24-9-67.1 (c) provides in relevant part:

[I]n professional malpractice actions, the *opinions of an expert*, who is otherwise qualified as to the acceptable standard of conduct of the professional whose conduct is at issue, *shall be admissible only if*, at the time the act or omission is alleged to have occurred, *such expert*:

(1) Was licensed by an appropriate regulatory agency to practice his or her profession in the state in which such expert was practicing or teaching in the profession at such time; *and*

(2) *In the case of a medical malpractice action, had actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given* as the result of having been regularly engaged in:

(A) The active practice of such area of specialty of his or her profession for at least three of the last five years . . . ; *or*

(B) The teaching of his or her profession for at least three of the last five years . . . *and*

(C) Except as provided in subparagraph (D) of this paragraph[,]. . . *[i]s a member of the same profession. . . .*

(D) Notwithstanding any other provision of this Code section, an expert who is a physician and, as a result of having, during at least three of the last five years immediately preceding the time the act or omission is alleged to have occurred, supervised, taught, or instructed nurses, nurse practitioners, certified registered nurse anesthetists, nurse midwives, physician's assistants, physical therapists, occupational therapists, or medical support staff, has knowledge of the standard of care of that health care provider under the circumstances at issue shall be competent to testify as to the standard of that health care provider. However, a nurse, nurse practitioner, certified registered nurse anesthetist, nurse midwife, physician's assistant, physical therapist, occupational therapist, or medical support staff shall not be competent to testify as to the standard of care of a physician.

(Emphasis supplied.)

The legislature's use of the word "or" between subparagraphs (2) (A) and (2) (B), followed by its use of the word "and" between subparagraphs (2) (B) and (2) (C), indicates that a medical expert must show *either* "active practice" or "teaching" for "at least three of the last five years," but that whichever of these may be the case, the expert must *also* be "a member of the same profession" as the

person whose performance he is evaluating. For the purposes of OCGA § 24-9-67.1, as for other purposes under Georgia law, then, a pharmacist is not a member of the same profession as a medical doctor. See OCGA § 24-9-67.1 (e) (only an affiant meeting the requirements of this statute may be "deemed qualified to testify as an expert by means of the affidavit required under Code Section 9-11-9.1"); OCGA § 9-11-9.1 (g) (11), (16) (defining "medical doctors" and "pharmacists" as two different "professions" to which the statute applies).

It follows that the trial court abused its discretion when it allowed Dr. Katz to testify concerning Dr. Smith's violations of a physician's standard of care. See *Nathans v. Diamond*, 282 Ga. 804, 805-806 (1) (654 SE2d 121) (2007) (affirming grant of summary judgment to defendant doctor where plaintiff's expert's affidavit failed to show that he had sufficient experience to satisfy requirements of OCGA § 24-9-67.1 (c)); *Beach v. Lipham*, 276 Ga. 302, 306 (3) (578 SE2d 402) (2003) (recommending changes to pattern jury instruction in medical malpractice cases as "intended to uphold the tradition of having physicians judged by their peers"); compare *Abramson v. Williams*, 281 Ga. App. 617, 618-619 (636 SE2d 765) (2006) (orthopedist with requisite knowledge and experience could properly testify concerning negligence of neurologist's standard of care). In light of Division 2, infra, however, we need not consider whether the admission of Dr. Katz's testimony on this subject was harmful error sufficient to grant a new trial.

2. Under OCGA § 9-3-71 (a), a medical malpractice action must be brought "within two years after the date on which an injury or death arising from a negligent or wrongful act or omission occurred." As the Supreme Court of Georgia recently emphasized, "the plaintiff's 'injury' as used in OCGA § 9-3-71 (a) has long been confined to the original negligent diagnosis." *Kaminer v. Canas*, 282 Ga. 830, 836 (1) (653 SE2d 691) (2007), citing *Stafford-Fox v. Jenkins*, 282 Ga. App. 667 (639 SE2d 610) (2006). In the latter case, this Court repeated the long-established rule that

the [plaintiff's] injury begins immediately upon the misdiagnosis due to the pain, suffering, or economic loss sustained by the patient from the time of the misdiagnosis until the medical problem is properly diagnosed and treated. The misdiagnosis itself is the injury and not the subsequent discovery of the proper diagnosis; thus, the fact that the patient did not know the medical cause of his suffering does not affect the applicability of OCGA § 9-3-71 (a).

(Footnote omitted.) *Stafford-Fox*, 282 Ga. App. at 669 (1); see also

*Kaminer*, 282 Ga. at 833 (1) (again citing *Stafford-Fox*). It follows from these principles that "[t]he true test to determine when the cause of action accrued is to ascertain the time when the plaintiff could first have maintained his action to a successful result." (Citation and punctuation omitted.) *Kaminer*, 282 Ga. at 833 (1).

(a) Harris's own undisputed evidence shows, and her brief on appeal concedes, that she was suffering from Gentamicin poisoning, with symptoms including substantial renal damage and nausea, by May 15, 2002. This apparent and continuous condition was the proximate result of either Dr. Smith's course of treatment with the drug, his failure to recognize the toxic condition and symptoms resulting from that treatment, or both. See *Stafford-Fox*, 282 Ga. App. at 669-670 (1) (plaintiff's cause of action for misdiagnosis of vitamin B-12 deficiency arose when she was first seen "manifesting continuous symptoms of a moderate [vitamin] B-12 deficiency, and [the defendant doctor] failed to make the diagnosis and provide treatment"). The fact that Harris did not know the cause of her symptoms on May 15, 2002 "does not lead to a different result [because] the subsequent disability" — in this case, inner ear damage — "was directly related to the initial symptoms and misdiagnosis" — here, Dr. Smith's failure to recognize Gentamicin poisoning. (Footnote omitted.) Id. at 669 (1); see also *Kaminer*, 282 Ga. at 834 (1) ("the statute of limitations on a medical malpractice claim no longer commences upon the occurrence of a negligent act or omission on the part of the physician," but "on the date of the patient's injury") (citation omitted).

(b) Harris seeks to forestall this conclusion by arguing that her development of inner ear damage on June 18, 2002, amounted to a "new injury" such that the statute would begin to run only at the appearance of that new injury. We disagree. As the Supreme Court made clear in both *Kaminer* and its more recent decisions on the subject, *Amu v. Barnes*, 283 Ga. 549 (662 SE2d 113) (2008), and *Cleaveland v. Gannon*, 284 Ga. 376 (667 SE2d 366) (2008), the "new injury" exception to the running of the statute from the first date of *any* injury attributable to the defendant doctor's negligence applies only "in the most extreme circumstances." (Citation and punctuation omitted.) *Amu*, 283 Ga. at 552. The exception cannot apply when (1) a patient has the "same condition" as at the first misdiagnosis and "experienced only symptoms otherwise attributable to the worsening of that condition," or (2) the patient did not "remain asymptomatic for a period of time following the misdiagnosis." (Citations and punctuation omitted.) Id. at 552-553; see also *Cleaveland*, 284 Ga. at 380 (1) (disapproving language in earlier cases, including *Whitaker v. Zirkle*, 188 Ga. App. 706 (374 SE2d 106) (1988), suggesting that the statute could run from the date of the

plaintiff's subjective "discovery" of the new injury rather than from "the date the patient first experienced symptoms" of that injury).

The case before us presents neither of the two prerequisites to the application of the "new injury" exception. Harris's renal damage as well as her inner ear damage were the result of the "same condition," Gentamicin poisoning, and her symptoms on May 15, 2002, included partial renal failure indisputably caused, in the course of a single week, by that poisoning. See *Kaminer* (patient had AIDS condition before and after misdiagnosis, and only the symptoms of that condition worsened); *Stafford-Fox* (patient had vitamin B-12 deficiency before and after misdiagnosis, and only the symptoms of that condition worsened). It follows that the trial court erred when it denied the defendants' motion for directed verdict by reason of the running of the two-year statute of limitation concerning Harris's claim from the date of the misdiagnosis concerning her Gentamicin poisoning accompanied by injury — that is, from May 15, 2002. *Kaminer*, 282 Ga. at 836-837 (1) (statute began to run on date of first injury attributable to misdiagnosis); *Stafford-Fox*, 282 Ga. App. at 669 (1) (same).

(c) Finally, Harris argues that because her own experts disagreed as to whether her kidney damage was detectable on May 15, 2002, the defendants' motion for directed verdict was correctly denied. See, e.g., *Cleaveland*, 284 Ga. at 382 (2), (3) (even if expert opinion testimony concerning likely symptoms of metastatic cancer is undisputed, defendant doctors would not be entitled to summary judgment because they "had the burden of proof"). We disagree.

Although Dr. Katz testified that Harris's May 15 creatinine level of 1.3 was within normal range, he also testified that this level nevertheless represented a 30 percent decrease in kidney function as a result of Gentamicin toxicity. We likewise read the testimony of Harris's other expert, Dr. Beck, as establishing beyond dispute that Harris manifested continuous symptoms of Gentamicin toxicity by May 15, 2002. As our Supreme Court held in its own precedent cited in *Cleaveland*:

> [W]here the plaintiff must produce an expert's opinion in order to prevail at trial, when the defendant produces an expert's opinion in his favor on motion for summary judgment and the plaintiff fails to produce a contrary expert opinion in opposition to that motion, then there is no genuine issue to be tried by the jury and it is not error to grant summary judgment to the defendant.

(Citations and punctuation omitted.) *Savannah Valley Production Credit Assn. v. Cheek*, 248 Ga. 745, 746 (285 SE2d 689) (1982). If

summary judgment may be granted in a case where a plaintiff has failed to produce expert testimony putting a material fact in dispute, then it follows, as our Supreme Court has also held, that j.n.o.v. may be granted to a defendant where a plaintiff's expert testimony, though provided, fails to put that material fact reasonably in dispute. See *Shea v. Phillips*, 213 Ga. 269, 272 (3) (98 SE2d 552) (1957) (reversing judgment for plaintiff where all the evidence, including plaintiff's expert medical testimony, "shows no fact or circumstance from which the jury could have found or inferred" that the defendant doctor was negligent).

3. In light of the above, Smith's asserted errors concerning the conduct of the trial are moot.

The trial court erred when it denied the defendants' motion for a directed verdict and for j.n.o.v. concerning the statute of limitation.

*Judgment reversed. Ruffin, P. J., and Bernes, J., concur.*

DECIDED NOVEMBER 3, 2008 — 

*Willis, McKenzie, DeGennaro & Alford, Charles J. Willis, Nathan D. Cronic*, for appellants.

*Bryan M. Pulliam*, for appellee.