**THIRD DIVISION**
**MIKELL, P. J.,**
**MILLER and BLACKWELL, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**June 25, 2012**

# In the Court of Appeals of Georgia

A12A0430. L-3 COMMUNICATIONS TITAN CORPORATION v.
   PATRICK.

MIKELL, Presiding Judge.

In this renewal personal injury action, the trial court denied defendants' motion for summary judgment, ruling that the plaintiff's opinions were admissible as expert testimony under OCGA § 24-9-67.1 (b). The trial court issued a certificate of immediate review, and this Court granted defendants' application for interlocutory appeal. We conclude that plaintiff's expert testimony fails to meet the requirements of OCGA § 24-9-67.1 (b) and was therefore inadmissible. Absent that testimony, plaintiff has not shown any causal connection between defendants' alleged negligence and the turnstile malfunction which resulted in plaintiff's injuries.

Therefore, the trial court erred in denying defendants' motion for summary judgment. Accordingly, we reverse.

We review de novo the grant or denial of a motion for summary judgment,[1] applying the following standard:

> Summary judgment is appropriate when no genuine issues of material fact remain and the evidence, construed in the light most favorable to the nonmoving party, warrants judgment as a matter of law. A defendant may obtain summary judgment by showing that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case.[2]

Properly construed, the record reflects that, while passing through one of the turnstiles at his workplace on September 6, 2001, David L. Patrick was injured when the turnstile reversed direction and one of its bars struck him in the head. He sued defendants L-3 Communications Titan Corporation, the party which had contracted to maintain the turnstiles, and two of its employees, Todd A. Manley and Roger G. Swift, whose duties included maintenance of the turnstiles. Patrick claimed that

---

[1] *McCullough v. Reyes*, 287 Ga. App. 483, 484 (651 SE2d 810) (2007).

[2] (Punctuation and footnote omitted.) *Butler v. Union Carbide Corp.*, 310 Ga. App. 21, 30 (2) (712 SE2d 537) (2011), citing *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). See OCGA § 9-11-56 (c).

defendants' negligent maintenance of the turnstile, specifically, defendants' failure to lubricate the turnstile and its pawl mechanism properly,[3] caused the turnstile's backlash and his resulting injury.

In support of his claim that a lack of lubrication caused the turnstile to ricochet, Patrick submitted his own affidavit, giving his opinion as an expert in the mechanics of turnstiles and pawl assemblies that "lack of adequate and scheduled lubrication" of the offending turnstile caused the incident at issue here. Defendants moved for summary judgment, asserting that Patrick's expert testimony should be disregarded because this testimony did not meet the standard for reliability set forth in OCGA § 24-9-67.1 (b). Following a *Daubert*[4] hearing, the trial court ruled that expert testimony was necessary to explain to the average juror why an unlubricated turnstile,

---

[3] This lawsuit was a renewal of an earlier lawsuit, which Patrick dismissed without prejudice. In that lawsuit, Patrick asserted that the turnstile malfunctioned because a pawl – a device intended to prevent reverse motion of the turnstile – had been removed or modified. In the renewal action, Patrick asserted that the pawl malfunctioned due to defendants' negligent failure to lubricate the turnstile adequately.

[4] *Daubert v. Merrell Dow Pharmaceuticals*, 509 U. S. 579 (113 SC 2786, 125 LE2d 469) (1993). See OCGA § 24-9-67.1 (d) ("Upon motion of a party, the court may hold a pretrial hearing to determine whether the witness qualifies as an expert and whether the expert's testimony satisfies the requirements of subsections (a) and (b) of this Code section").

when forced to turn, would move in the opposite direction; that Patrick was qualified as a mechanic with expertise in turnstiles and pawl assemblies; and that Patrick's lack-of-lubrication theory was admissible expert testimony to explain the turnstile's movement in the opposite direction. Defendants' motion for summary judgment was denied, and this appeal followed.

1. Defendants contend that Patrick's opinion of the cause of the incident at issue was inadmissable as expert testimony, on the ground that his testimony failed to meet the reliability requirements of OCGA § 24-9-67.1 (b). We agree.

We recognize that "[t]he issue of the admissibility or exclusion of expert testimony rests in the broad discretion of the court, and consequently, the trial court's ruling thereon cannot be reversed absent an abuse of discretion."[5] We also note that defendants were unable to direct us to an apposite case in which an appellate court in Georgia has reversed a trial court's ruling on the admissibility of expert testimony

---

[5] (Footnote omitted.) *Cotten v. Phillips*, 280 Ga. App. 280, 283 (633 SE2d 655) (2006). Accord *Butler*, supra at 25 (1).

under OCGA § 24-9-67.1 (b),[6] nor has our research found such a case.[7] Nonetheless, it is possible for a trial court to abuse its discretion in ruling on the admissibility of expert testimony, and we find an abuse of discretion in the case before us.

OCGA § 24-9-67.1 (b), which governs the admissibility of opinion testimony by qualified experts in civil cases,[8] provides that:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact in any cause of action to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if:

> (1) The testimony is *based upon sufficient facts or data . . .* ;

---

[6] The cases cited by defendants in their letter brief following oral argument in this case did not involve application of OCGA § 24-9-67.1 (b). *Bravo v. State*, 304 Ga. App. 243 (696 SE2d 79) (2010) (criminal case to which OCGA § 24-9-67.1 does not apply); *Hankla v. Jackson*, 305 Ga. App. 391, 395-396 (2) (a) (699 SE2d 610) (2010) (medical malpractice case involving application of special rules for such cases found in subsection (c) of 24-9-67.1); *Smith v. Harris*, 294 Ga. App. 333, 335-337 (1) (670 SE2d 136) (2008) (same).

[7] In *Hamilton-King v. HNTB Ga.*, 296 Ga. App. 864, 866 (1) (676 SE2d 287) (2009), this Court reversed as an abuse of discretion a trial court's exclusion of expert testimony proffered by plaintiffs; however, our Supreme Court reversed this decision in *HNTB Ga. v. Hamilton-King* ("*HNTB II*"), 287 Ga. 641 (697 SE2d 770) (2010).

[8] OCGA § 24-9-67.1 (a).

(2) The testimony is *the product of reliable principles and methods*; and

(3) The witness has applied the principles and methods *reliably* to the facts of the case.[9]

"In determining the admissibility of expert testimony, the trial courts acts as a gatekeeper, assessing both the witness'[s] qualifications to testify in a particular area of expertise and the relevancy *and reliability* of the proffered testimony."[10] As noted above, however, the trial court must act within its discretion in ruling on the admissibility of expert testimony. Moreover, the burden of establishing the reliability of the expert's opinion falls on the proponent,[11] in this case, Patrick, who is required to show that his proffered expert testimony is "based upon sufficient facts or data" and is "the product of reliable principles and methods," which he "applied . . . reliably to the facts of the case."[12] As our Supreme Court has explained,

> [r]eliability is examined through consideration of many factors, including whether a theory or technique can be tested, whether it has

---

[9] (Emphasis supplied.)

[10] (Citations omitted; emphasis supplied.) *HNTB II*, supra at 642 (1).

[11] *Butler*, supra at 26 (1).

[12] OCGA § 24-9-67.1 (b) (1) - (3).

6

been subjected to peer review and publication, the known or potential rate of error for the theory or technique, the general degree of acceptance in the relevant scientific or professional community, and the expert's range of experience and training.[13]

Applying these principles to the instant case, we conclude that the trial court abused its discretion in ruling Patrick's testimony admissible. In his affidavit, Patrick attributed the turnstile's ricochet to a lack of proper lubrication:

When the turnstile and its pawl assembly are not adequately lubricated and are set to spin in only one direction, the turnstile will not spin freely but will require more force to turn it than is usually required. At a certain point the force exerted by a person trying to enter through the turnstile becomes sufficient to overcome the friction created by the unlubricated pole. This suddenly released force causes the pole to spin with much greater force than is now necessary and the pole *spins quickly to its stopping point*. At that point a properly lubricated and functioning pawl should catch the pole and prevent the pole and spoke from returning in the opposition [sic] direction. However, where the pawl is not operating properly, the force of the impact of the pole *on its intended stopping point* causes an equal and forceful reaction in the opposite

---

[13] (Citation omitted.) *HTNB II*, supra, citing *Kumho Tire Co. v. Carmichael*, 526 U. S. 137, 141 (119 SC 1167, 143 LE2d 238) (1999) (in exercising its gatekeeping obligation, trial court may apply *Daubert* factors to determine reliability of testimony of engineers and other non-scientist experts); and *Daubert*, supra at 593-594 (II) (C) (listing pertinent factors for consideration in determining reliability of expert testimony).

7

direction. This causes the pole and its spokes *to backlash* against the person who initially furnished the force. The less lubrication there has been, the more force the person using the turnstile must exert to cause it to spin. The more force the person uses, the greater the force of the backlash.[14]

Patrick opined, based on his years of experience as a mechanic, that the turnstile "failed" on the day in question "because of lack of adequate and scheduled lubrication." He described the incident in which he was injured as follows: inadequate lubrication caused the turnstile to be difficult to turn; when he used enough force to start it to turn, it "suddenly broke free of the point binding it and *spun quickly to its stopping point*";[15] the pawl assembly, due to lack of lubrication, failed to prevent the turnstile from backlashing; and the turnstile "then returned towards [him] with all the force that [he] exerted to get it to move in the first place," striking him in the face and causing his injury.

At the hearing, however, Patrick could not testify as to whether the turnstile reached its intended "stopping point":

---

[14] (Emphasis supplied.)

[15] (Emphasis supplied.)

8

Q Your testimony today is that [the turnstile] did not go to its intended stopping point?

A Sir, I can't read the machine's mind. I don't think it has a mind of where it's going. It's a mechanical device. It either functions properly or it doesn't.

Patrick also conceded at the hearing that rather than spinning quickly, as described in his affidavit, the turnstile was hard to push; that it "*never* turned freely"; and that "it required a steady amount of force *through its cycle* to make it move forward."[16] Nonetheless, he testified that the turnstile, upon reaching its stopping point, then "moved *fast enough* to come back and hit [him] and [he] couldn't avoid it."[17] But he was unable to explain why the turnstile, if difficult to move in the intended direction due to lack of lubrication, would not be slow to move in the reverse direction as well:

Q What I'm trying to understand is why would [the turnstile] spin back toward you with so much force that you can't control it, you can't stop it if the same friction that made it so hard for you to push it to begin with is still working against it moving? That same friction would still be slowing it down as it's coming toward you.

---

[16] (Emphasis supplied.)

[17] (Emphasis supplied.)

9

A That would be fair that it would be slowing down, but I did have to push it considerable [sic] to get it moving and I'm sure it came back just as hard as I was pushing it.

When asked about the speed of the backlash, Patrick admitted that his opinions were not based on the laws of physics:

Q . . . Your testimony is that it is possible the bars could move back toward you faster than you were pushing them if there – even if there's no other force moving them other than the force you applied it's possible that [the turnstile] moved back faster.

A I would say yes, sir, it was possible.

Q That's based on your understanding of physics, is that possible?

A *That's not based on my understanding of any physics*, sir.

Q All right. What is it based on?

A That's based on the possibility that it could occur, that it's a mechanical device. It was certainly hard to push forward. I didn't try pushing it backwards. I don't know how hard it was to push backwards. The pawl assembly is engaged when it's moving forward and that could

10

have caused additional force to be required to push it forward. I didn't test it going backwards.[18]

 In contrast, however, Patrick later explained that the pawl was not "engaged" on the forward journey: "[t]he pawl assembly allows [the turnstile] to move forward in that clicking fashion. It just keeps it from coming backwards. That's the purpose of that pawl." And even though Patrick did not "try pushing it backwards," he testified that the turnstile "came back just as hard" as he had been pushing it in the intended direction. In other words, Patrick asserted that he himself had to supply the force to move the allegedly stiff, unlubricated turnstile forward; but that after he stopped supplying that force, the turnstile reversed direction and returned toward him with the same or, possibly, greater speed.

Patrick's testimony at the hearing thus shows clearly that his lack-of-lubrication theory did not explain why the turnstile, upon reaching a stopping point, suddenly ricocheted with such speed that he could not avoid it. We note that Patrick himself never examined the workings of the particular turnstile which injured him,

_____

[18] (Emphasis supplied.)

11

nor did he examine any of the similar turnstiles nearby.[19] Further, although Patrick contends that his theory is supported by the testimony of other witnesses who experienced difficulty in operating the turnstiles in question, their testimony went only to the fact that the turnstiles were hard to turn and sometimes stopped altogether; it did not provide any support for the proposition that a badly-lubricated turnstile would stop and then *ricochet* in the manner described by Patrick. Another co-worker testified that the turnstiles were difficult to push but became easier to push after he oiled them. Even if this testimony can be seen as "tests" which showed that the turnstiles suffered from lack of lubrication, it provides no support for Patrick's theory that the lack of lubrication caused the turnstiles to backlash "quickly."[20]

We believe that our Supreme Court's decision in *HNTB II*[21] is apposite to the case before us. Pretermitting the issue of whether Patrick was qualified to testify as

---

[19] At the hearing, Patrick testified that the Navy, which owned the turnstiles in question, did not allow examination or testing of the turnstiles; he also noted, however, that he "didn't believe testing would have had any bearing on my decision."

[20] Nor did Patrick's demonstrative evidence, the small "rotator assembly" with which Patrick demonstrated the workings of a pawl for the trial court, address this problem, because he did not attempt to use this mechanical device to show how lack of lubrication would cause "backlash."

[21] Supra.

an engineering expert, he has "failed to provide any indication of the principles and methods [he] employed . . . in reaching his conclusions, rendering them unreliable as defined by OCGA § 24-9-67.1 (b) (2) and (3) because they cannot be validated against accepted standards, tested or reviewed."[22] Although he repeatedly stated that it was "common knowledge," Patrick failed to cite any treatise or authority supporting his belief that an unlubricated turnstile and pawl mechanism would backlash so quickly that it could not be avoided.[23] As he admitted at the hearing, his hypothesis was also unsupported by any testing indicating that similar accidents would occur under similar unlubricated conditions.[24] "[Patrick's] conclusions, based solely on his own assertions, were unsupported by either the *Daubert* factors or any other reasonable reliability criteria."[25] In this case, we conclude that the trial court abused

---

[22] (Punctuation and footnote omitted.) Id. at 643 (1).

[23] See id.

[24] See id. at 644 (1). We recognize that Georgia law does not require evidence of testing or error rates in every case, but such evidence could provide some foundation for Patrick's opinion testimony. See id. As noted above, such evidence is absent here.

[25] Id., citing *Mason v. Home Depot U. S. A.*, 283 Ga. 271, 279 (5) (658 SE2d 603) (2008) (trial court properly excluded expert's testimony as not the product of reliable principles and methods, because it was based solely on personal experience and opinion unsupported by scientific journals or reliable techniques).

its discretion in admitting "opinion evidence which is connected to existing data only by the ipse dixit of the expert."[26]

2. In light of our conclusion in Division 1 above, we do not address defendants' remaining enumeration of error.

*Judgment reversed. Miller and Blackwell, JJ., concur.*

---

[26] (Punctuation omitted.) Id., citing *Gen. Elec. Co. v. Joiner*, 522 U. S. 136, 146 (III) (118 SC 512, 139 LE2d 508) (1997).