A07A0926. McCULLOUGH et al. v. REYES et al.
A07A0927. STATE FARM FIRE AND CASUALTY COMPANY
v. REYES et al.
(651 SE2d 810)

MIKELL, Judge.

These appeals stem from an action brought by Ulysses and Jill Reyes (the Reyeses) for the wrongful death of their son Aaron Reyes against defendants Clint and Angela McCullough (the McCulloughs) and Steve and Sara Pullen (the Pullens). The Pullens filed a third-party complaint, as amended, against State Farm Fire and Casualty Company (State Farm), seeking declaratory judgment of insurance coverage for the Reyeses' wrongful death action against them. In Case No. A07A0926, the McCulloughs appeal the denial of their

motion for summary judgment;[1] in Case No. A07A0927, State Farm cross-appeals the denial of its motion for summary judgment.[2] For the reasons stated herein, we reverse the decision of the trial court in both cases.

This Court's review of the grant or denial of summary judgment is de novo in order "to determine whether any genuine issue of material fact exists for resolution by a jury."[3] To prevail at summary judgment,

> the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law [pursuant to] OCGA § 9-11-56 (c). A defendant may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case. The burden on the moving party may be discharged by pointing out by reference to the affidavits, depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case. If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue.[4]

### Case No. A07A0926

Properly viewed, the record reflects that, at the time of Aaron Reyes's death, four people were living in the Pullens' home: Sam Pullen, age 13, his father Steve, his mother Sara (sister of Clint McCullough), and his grandfather, 91-year-old Alvin McCullough (father of Clint and Sara), who suffered from dementia. The house in which they lived was located on property owned by Clint McCullough, who had originally built the house in 2000 for his parents. Clint and Angela McCullough lived in another house on the same property, approximately "a couple hundred yards" away. The Pullen house was

---

[1] The trial court issued a one-sentence ruling based on the presence of material issues of fact and issued a certificate of immediate review. This Court granted the McCulloughs' application for interlocutory appeal.

[2] After the McCulloughs filed their notice of appeal on November 20, 2006, State Farm filed its notice of cross-appeal November 27, 2006. State Farm's cross-appeal is properly before this Court, and the Pullens' motion to dismiss State Farm's cross-appeal is hereby denied.

[3] (Footnote omitted.) *Hicks v. Walker*, 262 Ga. App. 216, 217 (585 SE2d 83) (2003).

[4] (Citation and punctuation omitted.) *Ethridge v. Davis*, 243 Ga. App. 11, 12 (530 SE2d 477) (2000).

constructed on an open plan, with a loft, in order to provide adequate handicapped access. Clint and Sara's mother, Alvin's wife, died in November 2002, and at Clint McCullough's request, the Pullen family moved into the home with Alvin in December 2002, with the understanding that Sara would provide the full-time care her father Alvin needed. No written lease was executed, and the Pullens, who were in some financial difficulties, were not required to pay rent, although they did make one $500 payment to the McCulloughs. The McCulloughs assisted from time to time with Alvin's care, in order to give Sara respite. Because Alvin was easily upset, the Pullens did not move their furniture into the house; instead, they stored most of their belongings in the basement of the McCulloughs' house. The Mc-Culloughs had a key to the Pullen house, but they did not enter without permission, even though theirs was an informal "family relationship."

For Christmas 2003 the Pullens gave their son Sam a .410 shotgun, which Sam kept on an unlocked gun rack upstairs in the loft at their home. The ammunition was stored separately. The Pullens required Sam to keep the gun unloaded in the house. The uncontradicted testimony was that, until the accident occurred on April 24, 2004, the McCulloughs had not been in the loft of the Pullen home at any time after the Pullens had moved into the house in December 2002. Although the McCulloughs were aware that Sam owned a shotgun, they did not know where this weapon was kept, and they did not know that it was loaded and accessible on the day that Aaron died.

On Saturday, April 24, 2004, Sam Pullen and his friends, Aaron Reyes, age 14, and Dru Lester, were playing outside on the patio at Sam's house when Aaron and Dru went inside the home to change clothes. No one else was inside at the time; Sam stayed outside on the patio with the adults gathered there: Alvin McCullough in his wheelchair, Sara and Steve Pullen, and Clint and Angela McCullough, who had arrived from their home to visit about half an hour before the two boys went inside. The McCulloughs were in the habit of visiting with the Pullens every day. It was not until the McCulloughs arrived on the patio, however, that they were aware that Sam had two visitors. The interior of the home's loft, which was used for Sam's clothes and general storage, was not visible to those outside on the patio. About five minutes after Aaron and Dru went inside, those on the patio heard a gunshot from the loft. They instantly rushed upstairs to find Aaron mortally wounded by a shot from Sam's gun, which had been left loaded and accessible.

1. The McCulloughs assert that the trial court erred in denying their motion for summary judgment because their arrangement with

the Pullens constituted a lease, and under OCGA § 44-7-14,[5] as a landlord not in possession, they were not responsible for the negligence of their tenants, the Pullens. Appellees, the Reyeses and the Pullens, contend that the issue of whether there was an actual lease between the parties is a material issue of fact which precludes summary adjudication in favor of the McCulloughs. Appellees assert that there was no lease here because the parties were related, the arrangement had not been reduced to writing, the McCulloughs did not expect the Pullens to pay rent, the McCulloughs retained a key to the Pullen house, and the McCulloughs paid certain utilities and services for both of the houses on their land. They further contend that the Pullen and McCullough families, though living in two separate structures, constituted "one household" for purposes of determining the McCulloughs' liability for Aaron's death.

A landlord-tenant relationship exists "when the owner of real estate grants to another person, who accepts such grant, the right simply to possess and enjoy the use of such real estate either for a fixed time or at the will of the grantor."[6] Contrary to appellees' assertions, a lease can exist between parties who are related to each other,[7] and neither a written lease agreement nor the payment of rent is required for a landlord-tenant relationship to exist.[8] Further, in this case it is undisputed that Sara Pullen provided care for the ailing father in exchange for a place for her family to live.[9] We conclude that the arrangement between the Pullens and the McCulloughs, whereby the Pullens obtained a place to live and the McCulloughs obtained assistance for Clint's infirm father, established a landlord-tenant relationship.

Further, we conclude that the McCulloughs were "not in possession," so that, under OCGA § 44-7-14, the McCulloughs were not responsible to the Reyeses for damages resulting from the negligence of their tenants, the Pullens, in allowing a loaded shotgun to be left accessible to unsupervised 14-year-old boys. The fact that the McCulloughs kept a key to the Pullen home does not mean that the McCulloughs retained possession. "That the landlord retains the right to enter the leased premises for landlord-related purposes does

---

[5] OCGA § 44-7-14 ("Having fully parted with possession and the right of possession, the landlord is not responsible to third persons for damages resulting from the negligence or illegal use of the premises by the tenant").

[6] OCGA § 44-7-1 (a).

[7] See *May v. May*, 165 Ga. App. 461-462 (1) (300 SE2d 215) (1983) (landlord-tenant relationship found to exist between parents and their son).

[8] See *S. S. Air v. City of Vidalia*, 278 Ga. App. 149, 150 (1) (628 SE2d 117) (2006); *May*, supra at 462 (1).

[9] See *Webb v. Danforth*, 234 Ga. App. 211 (505 SE2d 860) (1998) (verbal rental agreement provided that tenant was to maintain yard).

not evidence such dominion and control of the premises so as to vitiate the landlord's limited liability imposed by OCGA § 44-7-14,"[10] and replace it with the liability imposed by OCGA § 51-3-1,[11] the statute relied upon by appellees. Even if the McCulloughs did retain some qualified possession under this informal lease between family members, they did not retain any control over the loft area of the Pullen house where the hazard was found. The decisions relied upon by the Reyeses involved the landlord's retained control of common areas of an apartment complex,[12] and thus are not apposite.

2. Moreover, even were we to assume arguendo that no landlord-tenant relationship existed between the Pullens and the McCulloughs, summary judgment for the McCulloughs would still be appropriate, because the record fails to show that the McCulloughs had superior knowledge of any dangerous condition.[13] Whether an injured party is an "invitee" (and thus subject to the ordinary care standard of OCGA § 51-3-1) or a "licensee" (and thus subject to the "wilful and wanton" standard of OCGA § 51-3-2),[14] Georgia courts have ruled that the same standard of care applies. If a landowner knows or reasonably should anticipate the presence of the injured party, "it is usually wilful or wanton not to exercise ordinary care to prevent injuring a person who is actually known to be, or may reasonably be expected to be, within the range of a hidden peril on one's premises."[15] Because the McCulloughs knew or should have known that their nephew Sam would have friends occasionally come to visit him at his home, the McCulloughs as possessors of the land would be subject to liability for Aaron's injury by a loaded shotgun *if, but only if*, the McCulloughs (1) knew or had reason to know of the hazard, that is, the loaded gun, to be found in Sam's loft room, and then (2) failed to exercise reasonable care to make the condition safe or to warn visitors.[16] "The test for liability here is the [McCulloughs'] superior knowledge of the hazard":[17]

---

[10] Id. at 212.

[11] OCGA § 51-3-1 ("Where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe").

[12] See *Nesmith v. Starr*, 115 Ga. App. 472, 473 (155 SE2d 24) (1967); *Lidster v. Jones*, 176 Ga. App. 392, 393 (336 SE2d 287) (1985).

[13] See *Webb*, supra.

[14] OCGA § 51-3-2 (b) ("The owner of the premises is liable to a licensee only for willful or wanton injury").

[15] (Citation and punctuation omitted.) *Cooper v. Corporate Property Investors*, 220 Ga. App. 889, 891 (470 SE2d 689) (1996).

[16] Id.

[17] (Citation omitted.) Id.

Because a plaintiff cannot recover in a premises liability suit unless the defendant had superior knowledge of the hazard, the defendant is entitled to summary judgment if there is no evidence that it had superior knowledge or the undisputed evidence demonstrates that the plaintiff's knowledge of the hazard was equal to or greater than that of the defendant.[18]

Because the record in this case is devoid of any evidence that the McCulloughs knew that Sam had left his gun accessible and loaded on this or any other occasion, the trial court erred in denying summary judgment for the McCulloughs.

### Case No. A07A0927

In their amended third-party complaint against State Farm, the Pullens seek insurance coverage for the Reyeses' wrongful death action pursuant to a homeowners policy issued by State Farm to the McCulloughs. State Farm contends that the Pullens are not covered under the McCulloughs' homeowners policy because, within the terms of the policy, the Pullens are not "insureds" and the Pullen home is not an "insured location."

3. The policy defines the "insured" as "you [that is, the McCulloughs, the 'named insured' in the policy declaration] and, if residents of your household, . . . your relatives." Because Sara Pullen is Clint's sister, the relevant question becomes: Is there a question of fact as to whether the Pullens qualify as "residents" of the McCulloughs' household? In view of the record before us, we conclude that the Pullens and the McCulloughs maintained separate households as a matter of law.

Although the McCulloughs' homeowners policy does not define the term "household," this Court has defined "household" as "a domestic establishment including the members of a family and others *who live under the same roof*"[19] and also as "a family living *together*,"[20] where "family" means "a collective body of persons who live *in one house* or within the same curtilage and under one head or management."[21] Appellees argue that the Pullen home is within the "curtilage" of the McCullough home. The term "curtilage," however,

---

[18] (Citation omitted.) *Norman v. Jones Lang LaSalle Americas*, 277 Ga. App. 621, 624 (627 SE2d 382) (2006).

[19] (Citation and punctuation omitted; emphasis supplied.) *State Farm Fire & Cas. Co. v. Goodman*, 259 Ga. App. 62, 65 (3) (a) (576 SE2d 49) (2002).

[20] (Citation and punctuation omitted; emphasis supplied.) *Keene v. State Farm &c. Ins. Co.*, 114 Ga. App. 625, 626 (2) (152 SE2d 577) (1966), citing Black's Law Dictionary.

[21] (Citation and punctuation omitted; emphasis supplied.) Id.

generally refers to "[t]he land or yard adjoining a house, [usually] within an enclosure."[22] The Pullen home cannot be said to be within the "curtilage" of the McCullough home, 150 to 200 yards away, unless the word "curtilage" is to lose all meaning.[23]

In the context of automobile insurance coverage, this Court has ruled that

> [i]n determining whether [a relative] is a resident of [the insured's] household, a common roof is not the controlling element. Rather, the aggregate details of the family's living arrangements must be considered. Of critical importance to such an analysis is whether the family members have established and maintained separate households under different managements.[24]

Relying upon these automobile insurance coverage decisions, appellees assert that a fact question has been raised as to whether the Pullens and the McCulloughs all reside in the same household. Their reliance is misplaced. These cases concern the issue of whether several related people all living in *one* house can be said to maintain *separate* households.[25] In the case at bar, on the other hand, the issue before this Court is whether a jury question can exist as to whether two related families living in *two* separate houses can be said to maintain only *one* household.[26]

---

[22] Black's Law Dictionary 389 (7th ed. 1999).

[23] See generally *Scott v. State*, 270 Ga. App. 292, 293 (1) (606 SE2d 312) (2004) (for Fourth Amendment purposes, "curtilage" is only "the land immediately surrounding and associated with the home") (citation and punctuation omitted).

[24] (Punctuation and footnotes omitted.) *Southern Gen. Ins. Co. v. Foy*, 279 Ga. App. 385, 386-387 (631 SE2d 419) (2006), citing *Burdick v. Govt. Employees Ins. Co.*, 277 Ga. App. 391, 392 (1) (626 SE2d 587) (2006).

[25] See *Foy*, supra at 387 (separate households found where son paid rent to occupy a room in his mother's house and the two adults "live in different areas, do not cook or clean for each other, and come and go independently"); *Burdick*, supra (question of fact raised where daughter living in downstairs portion of her parents' house "paid rent to her parents, assumed responsibility for some of the house's bills, and was entirely responsible for her own child, including her daycare expenses"; but family often ate together and house had single exterior entrance and single mailbox); *Rainey v. State Farm &c. Ins. Co.*, 217 Ga. App. 618, 621 (458 SE2d 411) (1995) (father who maintained living accommodation at his daughter's house but admitted to living at apartment elsewhere at time of accident was not a resident of daughter's household; "[m]ore than mere physical presence and transient visitation is required to make a person a resident of a household") (citation omitted).

[26] Compare *Keene*, supra at 625-626 (1), (2) (evidence that grown son slept in one-room unimproved shed detached from mother's home did not demand conclusion of intent to sever household connection where son took meals, bathed, and had a bedroom available to him inside the home).

We recognize that "questions of domicile and residence are mixed questions of law and fact that are ordinarily for a jury to determine";[27] nonetheless, in the case before us no genuine issue of material fact remains. The unrebutted evidence shows that Clint and Angela McCullough lived in a house on Nathan Thaxton Road; and that Sara and Steve Pullen and their son Sam, along with Sara and Clint's father Alvin, lived in a different house, also on Nathan Thaxton Road. The two houses were 150 to 200 yards apart and were connected only by an open roadway. The result is not changed by evidence showing that both houses were located on property owned by Clint Mc-Cullough, that the McCulloughs paid bills to help out the financially-strapped Pullens, that both families helped each other with the common project of caring for their infirm patriarch, that Clint Mc-Cullough had a key to the Pullen house, that the Pullens stored the bulk of their belongings at the McCulloughs' house, and that the two houses shared a mailbox. Even a stranger visiting the McCulloughs' property would have no difficulty ascertaining which was the "Mc-Cullough place" and which was the "Pullen place." The two homes were distinct. Thus, because the Pullens were not "residents of [the McCulloughs'] household," they were not "insureds" under the Mc-Culloughs' homeowners policy.

In limiting homeowners insurance coverage to the named insured and related residents of his household, the insurance company is acting reasonably to provide that coverage for which it receives compensation in premiums.[28] Appellees essentially ask this Court to hold that related families living on land owned by a family member can pay premiums on a single homeowners policy and have insurance coverage extend to every house on the property — in this case, two homes; but why not six, or even twelve?[29] We are reluctant to force that interpretation on the policy language as a matter of law. As a matter of fact, the record shows that the insurance company had actual notice that the Pullens' house existed but, at the McCulloughs' application, had issued a "rental dwelling policy" applicable to that structure.[30]

---

[27] (Punctuation and footnote omitted.) *Foy*, supra at 386.

[28] Compare *Allstate Ins. Co. v. Czaplicki*, 241 Ga. App. 247, 248 (526 SE2d 78) (1999) (meaning of term "non-owned auto" in automobile insurance coverage context reflects insurer's intent "to cover only those uses . . . which will not materially increase the insurer's risk without a corresponding and compensating increase in premium") (citations omitted).

[29] In a tort (family purpose) rather than a contract context, this Court has refused to extend the meaning of "member of the defendant's *immediate household*" to a driver who lives apart from his parents. (Citation omitted; emphasis in original.) *Hurley v. Brown*, 255 Ga. App. 151, 152 (564 SE2d 558) (2002); *Simmons v. Hill*, 242 Ga. App. 22, 24, 25 (528 SE2d 557) (2000).

[30] See Division 4, below.

4. Appellees' argument that the Pullen home is an "insured location" fails under the plain language of the policy. The policy provides that

5. *"insured location"* means:
a. the *residence premises*;
b. the part of any other premises, other structures and grounds used by you as a residence. This includes premises, structures and grounds you acquire while this policy is in effect for your use as a residence; [and]
c. any premises used by you in connection with the premises included in 5.a or 5.b.

The terms "you" and "your" refer to the "named insured" shown in the policy declarations, that is, Clint and Angela McCullough. Thus, the definition of "insured location" is limited throughout to places the McCulloughs used as a residence, which would exclude the Pullen home. Further, the "Location of Residence Premises" is described as "Same as Insured's Address"; and the insured's address is shown as 241 Nathan Thaxton Road, that is, the McCulloughs' home, not the Pullen house. That the McCulloughs' home is meant here is clear from the undisputed evidence that State Farm issued another insurance policy (a Rental Dwelling Policy) on the Pullen home, which shows the address of that structure as 241-A Nathan Thaxton Road. In addition, although the two families' mail came to one mailbox, mail intended for the Pullens, such as their utility bill, was often directed to 241-A Nathan Thaxton Road. Thus, appellees' contention that the Pullen house is an "insured location" is without merit. We conclude that the trial court erred in denying State Farm's motion for summary judgment.

*Judgment reversed. Johnson, P. J., and Phipps, J., concur.*

DECIDED SEPTEMBER 11, 2007 — 

*Beck, Owen & Murray, William M. Dallas III, Janice M. Wallace*, for appellants (case no. A07A0926).

*Gray, Hedrick & Edenfield, Lloyd B. Hedrick, Jr., Hunter, Maclean, Exley & Dunn, Wade W. Herring II*, for appellant (case no. A07A0927).

*Fears, Lawrence & Turner, Alfred D. Fears, Sr., Douglas R. Ballard, Jr., Ausband & Farr, Andrew C. Ausband, Jones, Cork & Miller, Christopher B. Jarrard*, for appellees.