NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: June 21, 2023

S22G0838.  EFFICIENCY LODGE, INC. v. NEASON, et al.

PINSON, Justice.

The three plaintiffs in this case had each rented rooms at an extended-stay motel for some time. They fell behind on their rent and were threatened with immediate eviction. They sued to stop that from happening, claiming that they were in a landlord-tenant relationship with the motel and so could not be evicted without dispossessory proceedings in court. The motel, however, argued that it had signed agreements with the plaintiffs that foreclosed their claims because, among other things, the agreement stated that their relationship was one of "Innkeeper and Guest," and "not . . . Landlord and Tenant." The trial court agreed with the plaintiffs, and the Court of Appeals affirmed. We granted review.

We now vacate the Court of Appeals' opinion and remand with

direction so that the trial court may determine the parties' relationship under the proper legal framework, which we set out briefly here and fully below. The key question for the trial court is whether the parties created a landlord-tenant relationship. That relationship is created when a property owner "grants" to another the right "simply to possess and enjoy the use of" the owner's property, either for a fixed time or at the will of the grantor. OCGA § 44-7-1. This grant can be made expressly in a written agreement, but it may also be implied from the tenant's possession of the property with the landlord's consent. As to possession, for reasons we explain below, a person who uses the property as a dwelling place—as their home—can ordinarily establish actual possession for purposes of showing a landlord-tenant relationship. As to consent, whether the owner consented to another's possession is determined by first looking to a written agreement between the parties if one exists. Evidence of the parties' conduct may also be probative if a written agreement is ambiguous, or to show that the parties changed or mutually departed from the agreement.

We leave it for the trial court to apply this framework in the first instance, consistent with this opinion.

1. *Background*

(a) *Legal Framework*

Two legal relationships are at issue in this case. Both are between a property owner and a person who occupies that property, and both are defined by statute. Under either relationship, if the occupant fails to pay rent, the owner may take steps to remove him. But the rights of the non-paying occupant depend a great deal on which relationship he has with the property owner.

The first relationship is that of landlord and tenant. A landlord-tenant relationship is created when "the owner of real estate grants to another person, who accepts such grant, the right simply to possess and enjoy the use of such real estate either for a fixed time or at the will of the grantor." OCGA § 44-7-1 (a). If a tenant "holds possession of lands or tenements over and beyond the term for which they were rented or leased to such tenant or fails to pay the rent

3

when it becomes due," the landlord may make a demand for possession, OCGA § 44-7-50, and if the tenant does not deliver possession, the landlord may seek a writ of possession in superior court. OCGA § 44-7-49 et seq. In that proceeding, the tenant has rights, too, including the rights to assert defenses, to be heard at trial, and to appeal an unfavorable decision. OCGA §§ 44-7-51, 44-7-53, 44-7-56. These rights cannot be waived by contract. OCGA § 44-7-2 (b).

The second relationship is that of innkeeper and guest. An inn is a "tavern[ ], hotel[ ], [or] house[ ] of public general entertainment for guests," and a guest is "a person who pays a fee to the keeper of an inn for the purpose of entertainment at that inn." OCGA § 43-21-1. Unlike a landlord, an innkeeper does not need to file a writ of possession to remove a non-paying guest. Instead, the innkeeper may use a statutory "lockout" remedy when certain conditions are met: the guest must have signed a written statement "prominently setting forth in bold type the time period during which [the] guest may occupy an assigned room," and the agreed-upon time period must have expired. OCGA § 43-21-3.2. Under this lockout remedy,

4

"the guest may be restrained from entering such room and any property of the guest may be removed by the innkeeper to a secure place where the guest may recover his or her property without liability to the innkeeper." Id.

(b) *Facts*

Efficiency Lodge advertises as an extended-stay motel: its website invites guests to "Stay a nite *or* stay forever." The three plaintiffs—Armetrius Neason, Lynetrice Preston, and Altonese Weaver—each occupied their rooms at the Lodge for months or years. Neason still stays there, but Preston and Weaver have left.

When the plaintiffs first moved into Efficiency Lodge, they each signed a rental agreement. Neason and Preston also each signed a second agreement sometime after moving in. According to Neason, his second agreement was signed when he moved to a new room within the Lodge.[1]

Preston's and Neason's rental agreements each stated that

---

[1] Preston's initial agreement and Neason's second agreement were included in the record on appeal.

"The relationship of Innkeeper and Guest shall apply and not the relationship of Landlord and Tenant." Each referred multiple times to the occupant and the Lodge as, respectively, "Guest" and "Innkeeper." Both agreements also provided that rent was due every week and that management reserved the right to enter any room "for the purpose of inspection, housekeeping, maintenance and pest control." Both agreements had a space for listing additional occupants of the room, and both provided that "Guest and other occupants listed on rental agreement shall be the only persons who will reside in rental unit." Neither agreement listed any additional occupants, although Preston's daughters and grandson lived in the room with her. Preston testified that the Lodge told her she did not need to name her daughters or her grandson on her agreement.

The two agreements addressed the term of occupancy in slightly different ways. Both agreements included a blank space for the ending date of occupancy, and on both, the space was left blank. Neason's agreement stated that occupants could "rerent on a week

to week basis." Preston's agreement specified that she was "only allowed to stay for 180 days straight," after which she would have to vacate for two days before she could re-rent, although Preston testified that she lived at the Lodge consistently for two years without leaving and coming back. Finally, both agreements provided that if Efficiency Lodge terminated the agreement early for any violation of the agreement, "Guest shall be responsible for any and all expenses including attorney's fees and court cost incurred in affecting the eviction."

All three plaintiffs say, and the Lodge does not contest, that they used Efficiency Lodge as their home. Neason received his mail there, and he listed the Lodge as his address on his driver's licenses. Preston—who lived in her room with her teenage daughters and her grandson—used the Lodge's address to register her daughters for school, and the school bus picked them up there. In addition, both Neason and Preston decorated their rooms and moved in their personal belongings, including furniture and appliances. Preston also provided her own linens. The plaintiffs were responsible for cleaning

7

their rooms; the Lodge did not provide them with cleaning or repair services.

In 2020, during the COVID-19 pandemic, all three plaintiffs fell behind on their rent. In April 2020, Efficiency Lodge sent a letter to Preston and Weaver asking that they make arrangements to pay rent. The letter informed the plaintiffs that "Those guest[s] who have been with us for over 90 days may no[ ]longer be 'guest[s],' you may be 'tenants at will.' This means we may have to go through the courts to evict you for non-payment. Efficiency Lodge is trying to avoid this because per your rental agreement YOU will be the one responsible for all COURT COST[S]." Neason, although he did not receive a letter, was also led to believe that he could be evicted if he did not bring his rent current. Weaver ultimately was locked out of her room, although the other two plaintiffs were not.

(c) *Proceedings Below*

The three plaintiffs sued. They asked for a permanent injunction to stop Efficiency Lodge from evicting Neason and Preston without filing dispossessory actions against them, and for damages to

8

compensate Weaver for her past eviction. All three plaintiffs also asserted a general claim for damages. And they sought a temporary restraining order and interlocutory injunction to preserve the status quo while the case proceeded. Efficiency Lodge answered and then moved for judgment on the pleadings. The trial court held a hearing on the injunction motion and granted an interlocutory injunction. The plaintiffs then asked the court to convert it into a permanent injunction.

In separate orders, the trial court denied the Lodge's motion for judgment on the pleadings and granted the permanent injunction. The trial court noted that the plaintiffs used the Lodge as their long-term home with the Lodge's "permission and consent"; that the Lodge explicitly acknowledged in the April 2020 letter that the plaintiffs "may be 'tenants at will'"; and that Georgia law required the Lodge to pay an "innkeeper tax" only for the first 90 days of the plaintiffs' occupancy.[2] Given those circumstances, the trial court

---

[2] Under the part of the tax code dealing with taxes on hotel rooms, an innkeeper is "[a]ny person that furnishes for value to the public any room or

concluded that Efficiency Lodge did not meet the statutory or common-law definition of an "inn."

The Court of Appeals affirmed. To determine the parties' legal relationship the court looked first to the rental agreements, but it determined that they were "ambiguous" about the nature of the legal relationship: the agreements described the relationship as one of "Innkeeper and Guest," but they also expressly contemplated eviction actions in court, which is a thing *landlords* must do to evict *tenants*. See *Efficiency Lodge, Inc. v. Neason*, 363 Ga. App. 19, 23 (1) (a) (870 SE2d 549) (2022); OCGA § 44-7-49, et seq. To resolve this perceived ambiguity, the court focused on Georgia's innkeeper statutes

rooms, lodgings, or accommodations in a county or municipality and that is licensed by, or required to pay business or occupation taxes to, such municipality or county for operating a hotel, motel, inn, lodge, tourist camp, tourist cabin, campground, or any other place in which room or rooms, lodgings, or accommodations are regularly furnished for value." OCGA § 48-13-50.2 (2) (A). And under OCGA § 48-8-2 (31) (B), the taxes applicable to charges "for any room, lodging or accommodation furnished to transients by any hotel, inn . . . or any other place in which rooms, lodgings or accommodations are regularly furnished to transients for consideration"—that is, taxes on the charges collected by innkeepers—"shall not apply to rooms, lodgings, or accommodations supplied for a period of 90 continuous days or more."

and two appellate decisions that addressed whether certain residents of the inns in those cases were guests or tenants. Id. at 25-26 (1) (a) (quoting *Bonner v. Welborn*, 7 Ga. 296 (1849) and *Garner v. La Marr*, 88 Ga. App. 364 (76 SE2d 721) (1953)). Applying that law, the Court of Appeals noted, among other things, that the plaintiffs had lived at Efficiency Lodge for a long time with the Lodge's "permission and consent," that they brought many personal items with them, and that both Neason and Preston used the Lodge as their home address for official purposes. See id. at 26 (1) (a). In the Court of Appeals' view, "[n]one of these facts are consistent with the idea that Efficiency Lodge treated the Plaintiffs as the transient guests of a hotel as such is understood by a reasonably common person." Id. at 27 (1) (a). As a result, the court concluded that the Lodge was required to go through dispossessory proceedings to evict the plaintiffs, and further, that this requirement could not be waived by contract because the plaintiffs had used their rooms as their "permanent dwelling places." Id. at 27-28 (1) (b).

We granted certiorari to consider, generally speaking, whether

11

and when an extended-stay motel like Efficiency Lodge must go through dispossessory proceedings to evict occupants who have stayed there for a long time.

2. *Analysis*

(a) We begin with a basic but important point: the question we asked in this case—whether dispossessory proceedings are required to evict an occupant under these circumstances—turns on whether the parties' legal relationship is one of landlord and tenant. If the parties are in a landlord-tenant relationship, our landlord-tenant code sets out the landlord's remedy—and the tenant's rights—when a tenant fails to pay rent or stays past a specified rental term. That remedy is to go to court and get a writ of possession, which authorizes the landlord to have the tenant evicted by lawful means. See OCGA §§ 44-7-49, 44-7-50, 44-7-55. And neither that remedy nor the tenants' rights in such dispossessory proceedings may be waived. See OCGA § 44-7-2 (b).

It is true that in a given case, as here, the owner or operator of a motel might seek to rely on the statutory remedy granted to an

12

"innkeeper" to "restrain" a holdover "guest" from entering his room under the separate statutory framework that governs inns and their guests. OCGA § 43-21-3.2. But the question whether this particular statutory "lockout" remedy is available is separate from the question whether dispossessory proceedings are required. The lockout remedy is available if the requirements of the lockout statute are met— i.e., when an "innkeeper" has a "written statement prominently setting forth in bold type the time period during which a guest may occupy an assigned room, . . . separately signed or initialed by the guest," and that time period expires. Id. By contrast, dispossessory proceedings are required if the operator and occupant are in a landlord-tenant relationship.

These inquiries are not necessarily an either/or proposition, and answering one of these questions does not necessarily answer the other. To be sure, the landlord-tenant relationship and innkeeper-guest relationship are mutually exclusive. See *Bonner v. Welborn*, 7 Ga. 296, 307-308 (1849) (treating innkeeper-guest and landlord-tenant relationships as mutually exclusive). That is, if the

13

parties *are* in one of those relationships, they cannot be in the other. As we will explain below, a landlord-tenant relationship is created when an owner or operator grants the occupant the right of possession. See OCGA § 44-7-1. This transfer of possession is inconsistent with the transient, non-possessory relationship of innkeeper and guest. See id.; OCGA § 43-21-1 (1) ("'Guest' means a person who pays a fee to the keeper of an inn for the purpose of entertainment at that inn."). But the reverse is not necessarily true: the absence of a landlord-tenant relationship does not necessarily mean that parties are in an innkeeper-guest relationship (nor does it mean that the specific statutory conditions for taking advantage of the lockout remedy are met). By the same token, the absence of an innkeeper-guest relationship does not prove the landlord-tenant relationship that is the basis for requiring dispossessory proceedings to evict an occupant.

Here, the question we asked in granting review was whether an extended-stay motel must go through dispossessory proceedings to evict occupants who had stayed there for a long period of time. We

asked that particular question because it is the question this case squarely presents: the plaintiffs here sought a declaration that they are in a landlord-tenant relationship with Efficiency Lodge and an injunction that would prevent Efficiency Lodge from evicting them without initiating dispossessory proceedings. Because the question whether the plaintiffs are entitled to that relief turns on whether they are in a landlord-tenant relationship with the Lodge, we turn to the landlord-tenant relationship now.

(b) The relationship of landlord and tenant is a legal relationship defined by statute. That statute says this relationship is created when "the owner of real estate grants to another person, who accepts such grant, the right simply to possess and enjoy the use of such real estate either for a fixed time or at the will of the grantor." OCGA § 44-7-1 (a). This has been the way to create a landlord-tenant relationship in Georgia for quite a long time. See Code Ann. 1860 § 2261 ("When the owner of lands grants to another simply the right to possess and enjoy the use of such lands, either for a fixed time or

at the will of the grantor, and the tenant accepts the grants, the relation of landlord and tenant is created."); Irwin's Code Rev. 1867 § 2253; Irwin's Code Rev. 1873 § 2279; Code Ann. 895 § 3115; Code Ann. 1910 § 3691.

The focus here is on the transfer of the right of possession—the grant by the owner and acceptance by another—that is the hallmark of a landlord-tenant relationship. See, e.g., *Camp v. Delta Air Lines, Inc.*, 232 Ga. 37, 39 (205 SE2d 194) (1974) (explaining that the "cardinal rule" in determining whether an agreement creates a leasehold or an estate for years is to scrutinize the agreement "to ascertain what interest the parties intended to be conveyed or demised by it"). See also Restatement (Second) of Property, Land. & Ten. § 1.2 & Reporter's Note (1977) (reciting as blackletter law that "[a] landlord-tenant relationship exists only if the landlord transfers the right to possession of the leased property" and noting that this is "undoubtedly accepted dogma in this field of the law"). In particular, the question here is how to determine whether that transfer happened.

The short answer is that the intent of the parties controls. Because transferring the right to possession requires a grant by the owner and acceptance by another, OCGA § 44-7-1, we look to "the intention of the parties" to see whether the right was transferred, such that the relationship of landlord and tenant was created. *Potts-Thompson Liquor Co. v. Potts*, 135 Ga. 451, 456 (69 SE 734) (1910). See also *Plank v. Bourdon*, 173 Ga. App. 391, 394 (2) (326 SE2d 571) (1985) ("In distinguishing between a purported lease and an executory agreement to make a lease, the intention of the parties, as manifested by a writing, is a controlling element."); *Orr v. Neilly*, 67 F2d 423, 424 (5th Cir. 1933) ("[W]hether the relationship of landlord and tenant is created depends almost entirely upon the intention of the parties.") (citing *Potts-Thompson Liquor Co.*, 135 Ga. 451).

Discerning the parties' intent to create a landlord-tenant relationship is easiest when the parties transfer the right of possession expressly. In other words, the required transfer of the right of possession may be clearly established by express agreement. See, e.g., *Clayton Cty. Bd. of Tax Assessors v. Aldeasa Atlanta Joint Venture*,

17

304 Ga. 15, 16-17 (1) (815 SE2d 870) (2018) (agreement that "granted a five-year term of possession" of property created landlord-tenant relationship); *Ouseley v. Foss*, 188 Ga. App. 766, 767 (374 SE2d 534) (1988) (describing a "written lease transferring right of possession in a certain portion of property"); see also *Langley v. MP Spring Lake, LLC*, 307 Ga. 321, 325-326 (834 SE2d 800) (2019) (concluding that an agreement entitled "Apartment Lease Contract," which granted to one party the right to rent an apartment "'for use as a private residence,'" "demonstrate[d] the parties' clear intent to create a landlord-tenant relationship").

But even without an express agreement, the parties' intent to transfer the right of possession may be discerned through evidence from the parties' arrangement and the circumstances as a whole. See *Littleton v. Wynn*, 31 Ga. 583, 585 (1860) (recognizing that a landlord-tenant contract may be "either express or implied"); *McCullough v. Reyes*, 287 Ga. App. 483, 486 (1) (651 SE2d 810) (2007) ("neither a lease agreement nor the payment of rent is required for a landlord-tenant relationship to exist"). See also OCGA

18

§ 44-7-5 ("When . . . title is shown in the plaintiff and occupation by the defendant is proved, an obligation to pay rent is generally implied."); Restatement (Second) of Property, Land. & Ten. § 1.2, cmt. a ("Whether an arrangement between two parties with respect to leased property transfers to one of them the right to possession of the property depends on the intention of the parties, as revealed by the terms of their arrangement and the circumstances."). The requisite intent may be shown in this way with evidence that establishes that (i) a person is in actual possession of the property in question, (ii) with the owner's consent. See *Hawkins v. Tanner*, 129 Ga. 497 (59 SE 225) (1907) ("the relation of landlord and tenant exists where one person occupies the land or premises of another in subordination of the other's title and with his consent, express or implied") (quoting 18 Am. & Eng. Enc. Law (2d ed.) 164-165); *Sharpe v. Mathews*, 123 Ga. 794, 797-798 (51 SE 706) (1905) ("as a general rule, it is sufficient to create the relation [of landlord and tenant] if it appears to have been the intention of one to enter or occupy the premises in subordination to the title of the other"); *Littleton*, 31 Ga. at 585

19

(landlord-tenant contract "presumed from the title of the [landlord] and the possession of the other," and the presumption is "rebutted when it appears that the tenant does not hold under, but adversely to him who holds the title"); *S.S. Air., Inc. v. City of Vidalia*, 278 Ga. App. 149, 150 (1) (628 SE2d 117) (2006) (airline was tenant of city, despite lack of formal lease agreement, when airline occupied city land and built hangar on it with city's permission); Daniel F. Hinkel, 2 Pindar's Ga. Real Estate Law & Procedure § 11.3 (7th ed., Apr. 2023 update) ("Mere possession of the land of another will raise a presumption of tenancy. Such a presumption, however, is rebutted by proof that the occupant did not enter with the owner's consent or is holding adversely to him." (footnote omitted)).[3] Put simply, actual possession establishes the would-be tenant's acceptance of posses-

---

[3] A handful of early cases spoke in terms of a tenant's "occupation" rather than "possession" of the premises. See, e.g., *Hawkins v. Tanner*, 129 Ga. 497 (59 SE 225) (1907). It is not apparent from these decisions that those terms were used to mean different things, and given the clear and unchanging statutory language requiring a transfer of the "right to *possess* and enjoy the use" of the property, we do not read these decisions as deviating from the well-established understanding that a transfer of the right of possession is required.

20

sion, while the owner's consent establishes that the right to that possession was in fact granted. See OCGA § 44-17-1. We take each concept in turn.

(i) Possession is an important legal concept throughout property law. See *Thrasher v. City of Atlanta*, 178 Ga. 514, 529 (173 SE 817 (1934) ("Possession is the basis of all ownership."); Restatement (First) of Property § 7, cmt. (1936) ("There are many aspects of the law of real property that involve a consideration of these doctrines of constructive and actual possession."). Speaking generally, possession involves a physical relationship with and the exercise of sufficient acts of ownership and control with respect to the subject property. See, e.g., *Page v. Jones*, 186 Ga. 485, 491-492 (3) (198 SE 63) (1938) (actual possession of property could be established by person who "resided" on the property and "exercised acts of ownership over the property"); *Hadaway v. Smedley*, 119 Ga. 264, 269 (2) (46 SE 96) (1903) (noting that "evidences of [a person's] possession" of land included that he "resided upon the place and exercised acts of ownership and control"); Restatement (First) of Property § 7 ("A possessory

21

interest in land exists in a person who has (a) a physical relation to the land of a kind which gives a certain degree of physical control over the land, and an intent so to exercise such control as to exclude other members of society in general from any present occupation of the land; or (b) interests in the land which are substantially identical with those arising when the elements stated in Clause (a) exist."). But we need not (and do not) try here to define the contours of possession for all purposes. It is enough to say that when looking for a landlord-tenant relationship in a residential context, possession is ordinarily established when a person does a collection of things we normally associate with using the subject property as her dwelling place—as her home.

Using property as a home ordinarily establishes possession because the kinds of acts associated with using property as a home match up with traditional hallmarks of possession. As a general matter, possession may be shown through "acts of ownership and control," including a physical relationship to the property. *Hadaway*,

119 Ga. at 269 (2) (explaining that a person is evidently in possession of land when she "exercise[]s acts of ownership and control" over the land). See also *Wood v. McGuire*, 15 Ga. 202, 204 (1) (1854) ("possession must be constituted, either by residence on the land in person…accompanied with the exercise of ownership; or by cultivation of a portion of the land, accompanied by acts of ownership over the balance, or it must consist of acts of ownership, 'positive, definite, and notorious'"). See also Restatement (First) of Property § 7.[4] When someone uses property as a home—not just a place to sleep or stay for a short time—such use is marked by various acts of ownership

---

[4] Many of our cases addressing possession as a legal concept come from the law of adverse possession. Adverse possession is different from tenancy in one important way: by definition, it happens *without* the consent of the landowner. See OCGA § 44-5-161 (b) (clarifying that "[p]ermissive possession cannot be the foundation of" adverse possession); *Coates v. Jones*, 142 Ga. 237, 240 (82 SE 649) (1914) (explaining that a tenant cannot assert an adverse-possession claim on the property he occupies as a tenant). But because both adverse possession and tenancy involve the actual possession of property by someone who does not hold title to it, see *MEA Family Investments, LP v. Adams*, 284 Ga. 407, 408 (667 SE2d 609) (2008) (adverse possession of property extends only to the area of "actual possession"); *Hall v. Gay*, 68 Ga. 442, 443 (1882) ("[a]ctual adverse possession of land by itself for twenty years gives a good title by prescription…No paper title is necessary, nothing but actual *bona fide* possession, this is all which the law requires") (citation and punctuation omitted), the law of adverse possession is a useful comparator for guidance on what it means for a tenant to be in possession of property.

and control. Making a place home means maintaining a relatively continuous physical presence—both in person and with personal effects. It also typically means performing routine cleaning and maintenance; adding, removing, or altering fixtures, furnishings, and decor; and keeping belongings there. And importantly for purposes of showing possession, it means controlling access to the property by others: deciding whom to invite in as guests, see *Cham v. ECI Mgmt. Corp.*, 311 Ga. 170, 185 (856 SE2d 267) (2021) (Peterson, J., dissenting) ("The authority to host guests in your home is for many people a key element of what it means for a home to be yours."), and whom to keep out, using locks and any number of other security measures to protect one's privacy and safety, see *GeorgiaCarry.Org, Inc. v. Atlanta Botanical Garden, Inc.*, 306 Ga. 829, 844 (834 SE2d 27) (2019) (Peterson, J., concurring) (describing the right to exclude others from one's property as "'one of the most essential sticks in the bundle of rights that are commonly characterized as property'") (quoting *Dolan v. City of Tigard,* 512 U.S. 374, 393 (114 SCt 2309, 129 LE2d 304) (1994)). Put simply, the physical

relationship with and conduct towards property that is typical of making a place home are just the kinds of "acts of ownership and control" that establish possession. See, e.g., *Ammons v. Central of Ga. Ry. Co.*, 215 Ga. 758, 761 (1) (113 SE2d 438) (1960) (noting that "[a] tenant of premises . . . is the owner of its use for the term of his rent contract"); *Bentley v. City of Atlanta*, 92 Ga. 623, 627 (1) (18 SE 1013) (1893) ("A tenant, although he has no estate in the land, is the owner of its use for the term of his rent contract[.]") (citing 12 Am. & Eng. Enc. Law 719); *Wood*, 15 Ga. at 204 (1) (explaining that possession may be "constituted . . . by residence on the land in person"); *Kahn v. Britt*, 330 Ga. App. 377, 391-392 (7) (765 SE2d 446) (2014) (landlord-tenant relationship could exist when would-be tenant was "allowed to stay" at property and "kept personal property there" but did not pay rent or sign a lease); *McCullough*, 287 Ga. App. at 486 (landlord-tenant relationship established where, in return for caring for property owner's father, tenant was given "a place for her family to live" in a separate house on the property).

The idea that using property as a home ordinarily establishes

possession finds clear support in our landlord-tenant statutes and decisional law, too. The statutes contemplate that someone using property as a dwelling place is in possession of it: they carve out for special treatment a subset of landlord-tenant relationships where the tenant uses, occupies, or rents the property as a "dwelling place." See, e.g., OCGA § 44-7-2 (b) ("[i]n any contract, lease, license agreement, or similar agreement, oral or written, for the use or rental of real property *as a dwelling place*, a landlord or a tenant may not waive, assign, transfer, or otherwise avoid any of the rights, duties, or remedies" enumerated in other parts of the Code) (emphasis supplied); id. § 44-7-4 (a) (allowing municipalities to establish security standards "to prevent the unauthorized entry of premises occupied by a tenant *as a dwelling place*") (emphasis supplied). Implicit in that carve-out is the understanding that when someone uses the property as a dwelling place with the owner's permission, the right to possess and enjoy the property has been transferred. And consistent with this understanding, our decisions have equated the use of a property as a dwelling place with possession. See *Ammons*, 215

26

Ga. at 761 (1), 763 (7) (approving an injunction preventing a railway from "interfering with the occupancy and possession by the tenant . . . of the dwelling house which she occupies"); *Mackenzie v. Minis*, 132 Ga. 323, 330-331 (63 SE 900) (1909) (explaining that if a servant is a "tenant of his master," in that he has both a contract of employment and a separate "contract to rent a dwelling" belonging to the master, the servant may keep his contractual "right to retain possession of the premises" even if the employment contract ends); *Wood*, 15 Ga. at 204 (1).

Two caveats. First, possession is not established by a person's mere subjective belief that a property is or was her home. When we talk about using property as a dwelling place, it is shorthand for a collection of acts of ownership and control that is generally sufficient to establish possession in the residential context—but one still needs to provide evidence of those acts, which remain the touchstone of possession as a general matter. See, e.g., *Hadaway*, 119 Ga. at 269 (2); *Wood*, 15 Ga. at 204 (1) (1854). Second, none of this is to say that

27

using property as a dwelling place is the only way to establish possession. Not all tenants are residential tenants, and a commercial tenant, by contrast, ordinarily would possess property without living there. See, e.g., *S.S. Air*, 278 Ga. App. at 150 (1) (airline possessed land by building hangar on it). But sufficient evidence of conduct showing that the property is being used as a dwelling place ordinarily suffices to establish possession in the residential context.

(ii) As for consent, the question is simply whether the would-be tenant is in possession of the property with the owner's permission. As with the broader question whether the right of possession was transferred, consent to possession may be express or implied. See *Hawkins*, 129 Ga. at 497 ("'the relation of landlord and tenant exists where one person occupies the land or premises of another in subordination of the other's title, and with his consent, express or implied'") (quoting 18 Am. & Eng. Enc. Law (2d ed.) 164-165); Daniel F. Hinkel, 2 Pindar's Ga. Real Estate Law & Procedure § 11.1 (7th ed., Apr. 2023 update) (specifying that landlord's consent may be "express or implied").

Where to look for this consent? If the parties have a written agreement respecting the property (as here), the search starts there. Even an agreement between the parties that does not expressly transfer the right to possess and use the property may shed light on whether the owner intended to allow the other party to possess the property. Indeed, the agreement may well allow, or prohibit, just the kinds of acts of ownership and control that can establish possession. For instance, an agreement could require a renter to take responsibility for the security of people and personal items inside, provide his own furniture, take out the trash, and keep the premises clean, or it might give him authority to invite in or exclude others from the property—acts consistent with possession. On the other hand, the agreement could prohibit the occupant from making any alterations, performing maintenance, or having visitors, or it might restrict the hours at which the occupant can come and go, thus suggesting the opposite. In this inquiry, substance generally prevails over form; mere labels or talismanic language in an agreement are not dispositive, at least not by themselves. See *Atlanta Bread Co. Intl. v.*

29

*Lupton-Smith*, 285 Ga. 587, 589 (2) (679 SE2d 722) (2009) (looking to substance of contractual clause, "no matter the nomenclature assigned" to it, to determine whether it was a restrictive covenant); *Houston Gen. Ins. Co. v. Brock Constr. Co., Inc.*, 241 Ga. 460, 465 (246 SE2d 316) (1978) (Undercofler, P.J., concurring) ("You can call a camel an elephant but that won't make its hump disappear. Labels do not change substance."); *Wolkin v. Nat. Acceptance Co.*, 222 Ga. 487, 489 (150 SE2d 831) (1966) ("mere nomenclature" of contract stating it was a guaranty was not determinative when in substance contract was clearly one of suretyship). If an agreement between the parties plainly establishes consent (or lack thereof), that may be the end of the matter. See *Langley*, 307 Ga. at 324 ("When the terms of a contract are clear and unambiguous, the reviewing court looks only to the contract itself to determine the parties' intent."); *Terry v. State Farm Fire & Cas. Ins. Co.*, 269 Ga. 777, 778 (2) (504 SE2d 194) (1998) ("If the language of a contract is clear and unambiguous, the terms of the agreement are controlling and an appellate court should look no further to determine the intention of the parties."); see also

OCGA § 13-2-3 (providing that if a contract makes clear the parties' intention and the intention "contravenes no rule of law," the intention "shall be enforced").

But there are a few reasons a court may need to look beyond a written agreement. First, if the agreement leaves the parties' intentions ambiguous, extrinsic or parol evidence is "admissible to explain all ambiguities, both latent and patent." OCGA § 24-3-3 (b). See *Coppedge v. Coppedge*, 298 Ga. 494, 498 n.3 (1) (783 SE2d 94) (2016) (citing rule that "'if the contract contains an ambiguity that cannot be resolved through the rules of construction, the court may . . . consider parol evidence'"); *Armistead v. McGuire*, 46 Ga. 232, 235 (1872) (citing earlier, materially identical version of OCGA § 24-3-3 for the proposition that "the surroundings and understandings of the parties [to a contract] may be used to explain and discover the true meaning in doubtful cases"). In this context, that outside evidence could include the parties' course of conduct, see *Scruggs v. Purvis*, 218 Ga. 40, 42 (126 SE2d 208) (1962) ("The construction placed upon a contract by the parties thereto, as shown by their acts and conduct,

31

is entitled to much weight and may be conclusive upon them."), which could show, for instance, that a property owner knew about and allowed a renter to do things consistent with possession—decorating and furnishing the premises, taking on responsibility for cleaning and maintenance, entertaining houseguests, changing the locks—or that the owner discouraged or was unaware of these or other acts of ownership or control. Or, under certain circumstances, outside evidence could include oral agreements, see *Preferred Risk Mut. Ins. Co. v. Jones*, 233 Ga. 423, 425 (1) (211 SE2d 720) (1975) (oral agreements admissible to resolve ambiguity if oral agreement is not inconsistent with written contract and parties did not intend contract to encompass "the whole of the transactions between them"), which could include the parties' representations about the meaning of contractual terms.

And even if a written agreement is clear on its face, outside evidence may also be relevant to show the parties' changed intentions *after* the agreement is signed. Such evidence could show that the parties intended to modify their written agreement, see *Hanham*

32

*v. Access Management Group L.P.*, 305 Ga. 414, 417 (3) (825 SE2d 217) (2019) ("parties may modify a contract through course of conduct" that is supported by consideration and not prohibited by the contract or by law); *Am. Century Mortg. Investors v. Bankamerica Realty Investors*, 246 Ga. 39, 40 (2) (268 SE2d 609) (1980) (later oral agreement can modify the terms of a contract if it is supported by consideration), or that they intended to mutually depart from some of its terms, see *Hughes v. Great Southern Midway, Inc.*, 265 Ga. 94, 95 (1) (454 SE2d 130) (1995) (parties mutually departed from closing date in real estate contract by extending it until zoning issue was resolved).[5] In the case of a property rental, such evidence might show the parties modified or mutually departed from a term of the rental agreement by continuing to possess (and allowing the continued possession of) the premises, and continuing to pay (and accept-

---

[5] The parties' later course of conduct can even "operate to waive an otherwise validly enforceable written requirement that all modifications be in writing." See *Hanham v. Access Management Group L.P.*, 305 Ga. 414, 417 (3) n.2 (825 SE2d 217) (2019).

ing the payment of) rent, after the written term of occupancy expired. See OCGA § 44-7-5 ("[w]hen…title is shown in the plaintiff and occupation by the defendant is proved, an obligation to pay rent is generally implied").

Finally, evidence of the parties' conduct comes to the forefront in the absence of an express agreement between them. See, e.g., *McCullough*, 287 Ga. App. at 486 (1) (noting that a landlord-tenant relationship may exist even without a lease agreement). In that circumstance, the inquiry would reduce to the ultimate question whether the owner's conduct towards the party in possession of the property—including the kinds of evidence just discussed above—establishes that the possession was with the owner's permission rather than adverse.[6]

---

[6] A final note. The Court of Appeals below, relying on its own precedent, indicated that "'[w]hether a landlord-tenant relationship exists is a question of fact.'" *Efficiency Lodge*, 363 Ga. App. at 23 (1) (citing *Williams v. State*, 261 Ga. App. 511, 513 (1) (583 SE2d 172) (2003)). We overrule this precedent, because properly understood, the question whether a landlord-tenant relationship has been created is a mixed question of fact and law. The transfer of the right of possession is established by reference to historical facts—for example, evidence that a renter installed locks or put up a fence, or that the property owner told her he would allow her to live there. But the ultimate question is not merely

what happened in the real world, but whether what happened is properly characterized as a "grant[ ]" and "accept[ance]" of "the right simply to possess and enjoy the use of" the property. OCGA § 44-7-1. Such questions, which require a nuanced judgment whether given historical facts meet or add up to an abstract legal concept or standard—a "landlord-tenant relationship," or "adverse possession," or "domicile," for instance—are mixed questions of law and fact. See, e.g., *Am. Civil Liberties Union, Inc. v. Zeh*, 312 Ga. 647, 665-666 (3) (864 SE2d 422) (2021) (in defamation actions, whether someone is a public official is a mixed question of law and fact because it is determined on a case-by-case basis whether the facts of the person's position make it "one which would invite public scrutiny and discussion of the person holding it") (punctuation and citation omitted); *Harvey v. Merchan*, 311 Ga. 811, 820 & n.9 (2) (b) (ii) (860 SE2d 561) (2021) (question whether statute of limitations barred action, which turned in part on when defendant had "becom[e] aware" of her injuries, was mixed question of law and fact); *Dozier v. Baker*, 283 Ga. 543, 544-545 (2) (661 SE2d 543) (2008) (question of person's domicile is mixed question of law and fact). See also Harry T. Edwards & Linda A. Elliott, Federal Courts Standards of Review: Appellate Court Review of District Court Decisions and Agency Action 8 (3d ed. 2018) (mixed questions of law and fact require "nuanced assessment or characterization of the historical facts in light of the governing legal norms").

We do not address here, however, the precise division of labor for judge and factfinder in determining whether a landlord-tenant relationship is present. We have said that some mixed questions are ordinarily for the factfinder, but may be determined by the court as a matter of law when the evidence is undisputed or the answer to the question is "plain and palpable." *Dozier*, 283 Ga. at 544 (2). See also, e.g., *Harvey*, 311 Ga. at 820 n.9 (2) (b) (ii); *Pirkle v. Turner*, 281 Ga. 846, 848 (2) (642 SE2d 849) (2007) (adverse possession is "usually a mixed question of law and fact" where "jury decides whether the claimant has presented sufficient evidence to establish the elements of adverse possession"). Other times, as when the mixed question is a "fact-intensive, mixed question[ ] of constitutional law," the ultimate mixed question may be for the judge to answer (and when reviewing the mixed question on appeal, although we accept the trial court's underlying factual findings unless they are clearly erroneous, we "independently apply the law to the facts"). *State v. Gilmore*, 312 Ga. 289, 292 (2) (a) (862 SE2d 499) (2021) (quoting *Lilly v. Virginia*, 527 U.S. 116, 136-137 (119 SCt 1887, 144 LE2d 117) (1999)). But these decisions have not explained this different treatment of mixed questions, nor have we set out a consistent framework for determining when mixed questions of law and fact

35

### 3. *Application and Disposition*

On to this case. Neither court below had the benefit of the an-
alytical framework we set out above. So, although each court circled
around some of the right questions with respect to the landlord-ten-
ant relationship—for instance, the Court of Appeals noted that Nea-
son and Preston lived at the Lodge with the Lodge's "permission and
consent"—neither court assessed the legal significance of any such
findings or conclusions under the legal framework we have set out
above. Instead, both courts conflated that question to some degree
with the separate question whether the parties' relationship was one
of innkeeper and guest and at times seemed to treat the questions
as fully interchangeable: if the parties were not innkeeper and
guest, then they must be landlord and tenant. See, e.g., *Efficiency*

---

are decided by the judge or the factfinder. Compare Edwards & Elliot, *supra*
at 8, 14, 17-18 (explaining that a federal appellate court reviewing a mixed
question of law and fact "should consider the nature of the decisional process
implicated in light of the respective institutional strengths" of trial courts,
which can weigh the credibility and demeanor of witnesses and articulate his-
torical facts, and appellate courts, which can exercise "reflective dialogue" and
"collective judgment" to clarify legal principles). We leave these questions for
another day because we do not need to resolve them here: the trial court served
as both judge and factfinder below, and will continue to do so on remand.

*Lodge*, 363 Ga. App. at 27 (explaining that the Lodge was required to initiate dispossessory proceedings because the facts were not "consistent with the idea that Efficiency Lodge treated the Plaintiffs as the transient guests of a hotel"). But as we noted above, the two questions are not strictly either/or in nature. A landlord-tenant relationship is created by the transfer of the right of possession, see OCGA § 44-7-1, while the innkeeper-guest relationship is marked by payment of a fee "for the purpose of entertainment at" an inn, OCGA § 43-21-1. See also OCGA § 43-21-1 (2) (defining an "inn" as a "tavern[]," "hotel[]", or "house[] of public general entertainment"). To be sure, a transfer of the right of possession is inconsistent with the transitory, fee-for-entertainment relationship of innkeeper and guest, so proving that the parties *are* in one of these relationships would prove that they are *not* in the other.[7] But applying the appropriate legal standard and proving that the parties are *not* in one of

---

[7] The Restatement (Second) of Property offers a helpful illustration of the point that a true innkeeper-guest relationship does not involve any transfer of the right to possession. If a person with a hotel reservation arrives to find

37

these relationships does not necessarily prove that they *are* in the other one. For example, our innkeeper statutes provide that "[p]ersons entertaining only a few individuals, or simply for the accommodation of travelers, are not innkeepers but are depositories for hire and are bound to ordinary diligence." OCGA § 43-21-2. Someone who qualifies as a depository for hire under this provision is not an innkeeper, but neither are they likely a landlord to travelers passing through. The point is that each inquiry must be conducted separately to ensure that the proper legal test is applied to determine whether the asserted relationship exists.

Because we are generally a court of review, we leave it to the trial court in the first instance to apply the legal framework we have set out here to the facts of this case. See Ga. Const. of 1983, Art. VI, Sec. VI, Para. II ("The Supreme Court shall be a court of review . . .

---

that her reserved room is occupied, neither she nor the hotel would contemplate that she has a remedy against the other occupant. Instead, the hotel can just offer her another room. This is because she was not granted a right to possess a particular room but, in the words of Georgia's statute, paid a fee for the purpose of entertainment at the inn. See Restatement (Second) of Property, Land. & Ten. § 1.2, Illustration 1 (1977); OCGA § 43-21-1.

."); *Wallace v. Wallace*, 301 Ga. 195, 198-200 (II) (800 SE2d 303) (2017) (declining to make findings of fact and conclusions of law in the first instance, and remanding for trial court to do so). To that end, we vacate the Court of Appeals' decision with direction to vacate the trial court's orders and remand for further proceedings.

On remand, the question whether the parties created a landlord-tenant relationship turns on whether Efficiency Lodge "granted" to the plaintiffs the right "simply to possess and enjoy the use of" their rooms. OCGA § 44-7-1 (a). To answer that question, the trial court should apply the legal framework we have laid out here. If the grant was not made expressly, the trial court should determine whether the transfer of the right of possession is properly implied based on the evidence, including the written agreement and, if necessary, the parties' conduct relevant to the questions of possession and consent.

Consistent with this opinion, the parties' written rental agreements are the place to start. Although we do not reach any conclusions here as to the effect of those agreements, we note that each one

39

says that "the relationship of Innkeeper and Guest shall apply and not the relationship of Landlord and Tenant." As we explained above, the substance of the relationship controls "no matter the nomenclature assigned" to it, *Atlanta Bread Co.*, 285 Ga. at 589. But this language may well be evidence of the parties' intent *not* to transfer the right of possession to the plaintiffs or to consent to their possession, at least at the time the agreement was signed. It is up to the trial court on remand to determine the weight to give this and other language in the agreement, as well as the other evidence in the record, in its analysis.

If the trial court concludes that the Lodge was in a landlord-tenant relationship with any plaintiff, then the Lodge will need to obtain a writ of possession to evict that plaintiff. If the trial court concludes that the Lodge was not in a landlord-tenant relationship with any particular plaintiff, the court may revisit the separate questions whether the parties were in an innkeeper-guest relationship and, if so, whether Efficiency Lodge could properly take advantage of the "lockout" remedy granted to innkeepers under the

conditions set out in OCGA § 43-21-3.2.

*Judgment vacated and case remanded with direction. All the Justices concur.*